# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE RAPID RIVER, *et al.*,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>CHERYL PROBERT, *et al.*,<br><br>　　　Defendants. | Case No. 3:18-cv-00465-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiffs Friends of the Rapid River and Friends of the Clearwater's (collectively "Plaintiffs") Motion for Summary Judgment (Dkt. 16), as well as Defendants Cheryl Probert and Victoria Christiansen's (collectively "Defendants" or the "Forest Service") Motion for Summary Judgment (Dkt. 18). Plaintiffs have also filed a Motion to Supplement Extra-Record Evidence. Dkt. 20.

The Court held oral argument on July 9, 2019, and took the motions under advisement. For the reasons outlined below, the Court finds good cause to GRANT Defendants' Motion for Summary Judgment, DENY Plaintiffs' Motion for Summary Judgment, and DENY Plaintiffs' Motion to Supplement Extra-Record Evidence.

## II. BACKGROUND

### A. Factual Background

The United States Forest Service ("Forest Service") is an agency under the United

States Department of Agriculture and is responsible for managing the 4 million-acre Nez Perce-Clearwater National Forests located in north-central Idaho.[1] One of the Forest Service's objectives is to sustain the health, diversity, and productivity of the forests it manages. This can take many forms, but one form, pertinent to the present case, is the Forest Service's authority to implement projects designed to reduce the risk of insect or disease infestation and increase the resilience of forest land to future catastrophic wildfires.

On February 7, 2014, President Barack Obama signed The Agricultural Act of 2014 (the "2014 Farm Bill"), an amendment to the Healthy Forests Restoration Act ("HFRA") of 2003. Most projects under HFRA must comply with the review requirements of the National Environmental Policy Act ("NEPA") in that the Forest Service must prepare certain reports and assessments, allow a period of public comment, and investigate reasonable alternatives to the proposed projects. 16 U.S.C. § 6514(b).

That said, the purpose of HFRA is to prioritize projects intended to address the threats to forest health posed by catastrophic wildfire, disease, and insect infestation. *See, e.g.*, H.R. REP. No. 108-96, pt. 1, at 3 (2003). Recognizing the "extraordinarily lengthy procedural and documentation requirements that federal land managers face" as an obstacle to completing urgent forest health work, Congress included in HFRA numerous procedures designed to reduce the burden of NEPA analyses. *Id.* These include expedited NEPA procedures for specified hazardous fuel reduction projects, 16 U.S.C. § 6514, and a categorical exclusion from NEPA for specified silvicultural treatments, *id.* § 6554(d). In

---

[1] The project at issue in this case is located in Idaho County, Idaho, approximately five miles west of Riggins and three miles southwest of Pollock.

short, there are limited and specific exceptions to the general requirements that HFRA projects comply with the review requirements of NEPA.

For context, a brief history of NEPA is helpful. Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 558 (1978). NEPA imposes procedural, rather than substantive requirements, and it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012). Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-1508, provide guidance for implementation of NEPA and are entitled to substantial deference. *Robertson*, 490 U.S. at 355.

Forest Service actions that directly affect the physical environment are generally subject to NEPA and—pursuant to regulations promulgated by the Forest Service and CEQ—are analyzed in either an environmental impact statement ("EIS"), an environmental assessment ("EA"), unless it falls under a categorical exclusion ("CE"). *See* 40 C.F.R. §§ 1500.1-1508.28; 36 C.F.R. § 220.6. CEs are classes of actions that "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency . . . ." 40 C.F.R. § 1508.4.

Under NEPA, federal agencies must prepare an EIS for "major Federal actions

significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C).

To determine whether an action requires an EIS, the agency may prepare an EA, which is

a "concise" analysis that may result in a finding of no significant impact ("FONSI"). 40

C.F.R. § 1501.4(b). "If the agency concludes there is no significant effect associated with

the proposed project, it may issue a FONSI in lieu of preparing an EIS." *Envtl. Prot. Info.*

*Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006).

 Notably, NEPA does not apply to federal actions that Congress has explicitly

exempted from the statute's requirements. *See, e.g.*, 36 C.F.R. § 220.4(a)(4) (indicating

that proposed actions are not subject to NEPA when they are "statutorily exempt"). For

example, Section 602 of the 2014 Farm Bill provides that state governors may designate

certain treatment areas for immediate consideration in order to address insect or disease

threats.

This 2014 Farm Bill CE for forest resilience projects specifically legislates an

exemption from the environmental analysis and public involvement requirements of NEPA

for insect or disease infestation reduction projects up to 3,000 acres in size in designated

areas. In other words, if the projects falls within specified parameters, the Forest Service *is*

*not required* to produce a detailed environmental impact statement under NEPA. 16 U.S.C.

§ 6591b.

The 2014 Farm Bill CE authorizes the Forest Service to first designate landscape-

scale treatment areas where there is declining forest health from insect or disease

infestation, and then it conditionally permits the Forest Service to undertake treatment

projects of up to 3,000 acres in size in these designated areas. To qualify for the legislative

exemption, such projects must "maximize[] the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands[2] that are resilient to insects and disease" and, "consider[] the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity." 16 U.S.C. § 6591b(b)(1)(A)–(B).

In 2014, the Governor of Idaho wrote a letter asking the Secretary of Agriculture to designate certain landscape-scale treatment areas within the National Forest System lands in Idaho that were at high risk of insect and disease mortality. The Governor identified more than 1.8 million acres for priority treatment, and observed that multiple agencies, organizations, and citizens contributed to this collaborative effort to propose treatment areas. As a result, the Chief of the Forest Service designated these areas as "landscape-scale insect and disease areas" prioritized for treatments under HFRA. Portions of the Nez Perce-Clearwater National Forest, such as the Windy-Shingle Project area, were included in these designations.

The Forest Service identified the need to reduce the risk of insect and disease infestation as well as reduce the threat of wildfire to the local communities and surrounding federal land in the Windy-Shingle Project (the "Project") area. Consequently, the Forest Service initiated the Project in September 2016, to address forest health and hazardous fuel concerns. According to the Forest Service, the authorized treatments projects it plans to

---

[2] A forest stand is a contiguous community of trees sufficiently uniform in composition, structure, age and size class distribution, spatial arrangement, site quality, condition, or location to distinguish it from adjacent communities. S Nyland, Ralph D. (2007). *Silviculture: concepts and applications*, 2nd ed. Prospect Heights: Waveland Press.

undertake in the 2,709 acres of the 24,000-acre Project area will move the area toward desired plant/tree stand conditions and help create a healthier and more resilient landscape.

In an October 2017 Decision Memorandum (the "Decision") approving the Project, the Forest Service authorized timber harvest on 2,510 acres, all of which are located in areas designated by the Forest Service as areas suitable for timber management. The authorized timber harvest consists of 1,304 acres of intermediate harvest and 1,206 acres of regeneration harvest. Intermediate harvest, or thinning, will remove smaller trees that are diseased or dead and focus on areas where the growth of western larch or ponderosa pine can be enhanced or maintained. Regeneration harvest will create a new age class of preferred and more resilient species, with the exception of single or patches of trees left as shelterwood or seed trees in certain treatment areas.

In addition to timber harvest, the Project authorizes fuel treatments to reduce hazardous fuel loads. The Forest Service's Windy-Shingle Project Decision (the "Decision Memorandum") authorizes a fuel break of approximately twenty-nine acres adjacent to private land. This fuel break is intended to slow advancing fires and provide firefighters with improved access and safety in the event of a wildfire. The Decision Memorandum also authorizes prescribed burning on approximately 126 acres to consume surface fuels and ladder fuels (firefighting terms for live or dead vegetation that allows a fire to "climb" up from the forest floor to the canopy) without impacting the canopy. Finally, the Forest Service will apply rehabilitation treatments to one forty-four-acre unit consisting of non-commercial-sized Grand fir and Douglas fir pole timber infested with mistletoe. These stands will be clear-cut, burned, and replanted with Western larch.

In the present case, Plaintiffs challenge the Forest Service's Decision to implement the Windy-Shingle Project on the Nez Perce National Forest pursuant to the 2014 Farm Bill categorical exclusion. Plaintiffs allege that, in approving this project, the Forest Service has not stayed within their statutory scope or complied with their own governing forest plan.

## B. Procedural Background

Plaintiffs filed the instant Complaint on October 23, 2018, requesting that the Court issue a declaratory judgment finding that the Windy-Shingle Project was not authorized pursuant to law and to enjoin its implementation. Plaintiffs' identify three claims for relief: 1) The Decision violates the Healthy Forest Restoration Act (specifically, that the McClinery gravel-pit expansion violates HFRA); 2) The Decision violates the National Forest Management Act ("NFMA") and HFRA (specifically, the protection of "old-growth" trees); and 3) The Decision violates NEPA, the NFMA, and HFRA (specifically, the Forest Service's failure to supplement its analysis after the Rattlesnake Creek fire).

Plaintiffs have standing to bring these specific claims because their members would otherwise have standing to sue in their own right. Additionally, the interests at stake are germane to each organization's purpose, and neither the claims asserted, nor the relief requested, require the participation of individual members in the lawsuit. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990).

As an administrative agency review lawsuit, discovery in this case was limited to the administrative record. Following this limited "discovery," the parties filed cross-motions for Summary Judgment. Dkts. 16, 18.

Plaintiffs subsequently filed a Motion to Supplement Extra-Record Evidence in an effort to provide certain material to the Court in aid of its decision. Dkt. 20. Defendants oppose the supplemental motion. Dkt. 23.

Defendants also filed a Notice of Supplement Authority (Dkt. 25), which Plaintiffs object to (Dkt. 26), asserting the cases are inapposite and/or irrelevant.[3]

### III. LEGAL STANDARD

In the context of agency review, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Because of the court's limited review under the APA, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are sought in agency review cases. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).

A court's review of an agency's compliance with the NFMA, NEPA, and HFRA is governed by the Administrative Procedure Act ("APA"). *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating

---

[3] This "Notice" is not an actual motion that must be ruled upon, however, the Court mentions it here as those cases will be addressed later in this decision.

NFMA and NEPA are reviewed under the Administrative Procedure Act." (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005)); *see also Native Ecosystems Council v. Erickson*, 330 F. Supp. 3d 1218, 1228 (D. Mont. 2018) ("Because HFRA includes no private right of action, agency actions under HFRA are [] reviewed under the APA.").

In this context, the Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).[4] A court also applies the APA

---

[4] The oft-used "arbitrary and capricious" standard in APA cases includes other grounds for overturning agency action. The Court's scope of review is as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. While the Court has considered all of these factors, for brevity, it often simply states that Plaintiffs have not shown the Forest Service actions were "arbitrary and capricious." Such a phrase encompasses all relevant grounds outlined in § 706.

standard to an agency action alleged to be "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

"[T]his standard is highly deferential, presuming that agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quotation omitted), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). "The agency's action need only be a reasonable, not the best or most reasonable, decision." *River Runners*, 593 F.3d at 1067 (internal quotations omitted).

Thus, the Court may not overturn an agency decision "because it disagrees with the decision or with the agency's conclusions about environmental impacts." *Id.* at 1070. It must "affirm[] the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All.*, 475 F.3d at 1140. For an action to be upheld, the agency need only articulate a "rational connection between the fact found and choices made." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Court is to be "most deferential" when, as here, "the agency is making predictions, within its [area of] special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (quotations and citation omitted); *accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). When

examining an agency's "scientific determinations . . . a reviewing court must generally be at its most deferential." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

## IV. ANALYSIS

### A. Motions for Summary Judgment

In their Motion for Summary Judgment, Plaintiffs assert that the Forest Service exceeded its statutory authority as applied to their first two causes of action: 1) by approving the expansion of the McClinery Pit; and 2) by failing to comply with the governing forest plan maintaining old-growth trees. Plaintiffs did not request summary judgment on their third cause of action and, in fact, conceded that claim at oral argument.

Defendants' Motion for Summary Judgment argues the inverse of Plaintiffs' contentions. Said differently, the parties move for summary judgment on the same issues. Accordingly, the Court will address the motions for summary judgment simultaneously as to each of the disputed topics.

#### 1. Gravel Pit Expansion (Claim One)

As part of its Decision Memorandum approving the Windy-Shingle Project, the Forest Service included a proposal to expand an existing gravel pit in the affected area—the McClinery gravel pit—by three acres. Plaintiffs claim the Forest Service is exceeding their authority with this proposal.

The Forest Service originally developed the McClinery gravel pit in 1990 as part of the Shingle Forks Timber Sale. The Forest Service has historically used the McClinery pit

as a source of aggregate for the formation and resurfacing of roads in the area. In the Decision Memorandum for the Windy-Shingle Project, the Forest Service authorized—as part of its efforts to implement the necessary forest restoration and fuel management treatments—the maintenance, repair, and reconstruction of certain existing roads, and the construction of 3.9 miles of temporary roads that the Forest Service will decommission within three years after Project completion.

The Forest Service argues that the McClinery pit is necessary because Forest Service roads in the Project area are not paved; instead, these roads require gravel resurfacing and grading and the McClinery pit provides the Forest Service with a local source of materials for this type of road maintenance. The Forest Service explains that it does not intend to construct any new permanent roads and that about 5.6 miles of currently existing roads in the Project area will be decommissioned at the end of the Project, along with the 3.9 miles of temporary roads constructed just for these project objectives. The Forest Service plans to reserve topsoil at the pit and to reseed the area following implementation.

The Forest Service's purported intentions aside, Plaintiffs assert that the expansion of the McClinery pit is not authorized under HFRA. The congressional CE under which Idaho's governor designated the Project area for priority treatment is limited to a "forest resilience project" which permits "authorized hazardous fuel reduction projects" 16 U.S. C. § 6591a(d)(3), not gravel pit projects.

"Authorized hazardous fuel reduction projects" is a statutory term defined by HFRA itself to include only those "measures and methods described in the definition of

'appropriate tools' contained in the glossary of the Implementation Plan . . . ." 16 U.S.C. §

6511(2)(A). HFRA further defines "Implementation Plan" as follows:

> The term "Implementation Plan" means the Implementation Plan for the Comprehensive Strategy for a Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment, dated May 2002, developed pursuant to the conference report to accompany the Department of the Interior and Related Agencies Appropriations Act, 2001 (House Report No. 106-64) (and subsequent revisions).

16 U.S.C. § 6511(11). In turn, "appropriate tools" for an "authorized hazardous fuel reduction project" refers to methods for reducing hazardous fuels, such as "prescribed fire, wildland fire use, and various mechanical methods such as crushing, tractor and hand piling, thinning (to produce commercial or pre-commercial produces), and pruning." *See* Implementation Plan, p. 18 (glossary).[5]

Plaintiffs claim that the construction or expansion of a gravel pit is not a method for "reducing hazardous fuels" and, furthermore, that the expansion of the McClinery gravel pit exceeds the scope of this project by the Forest Service's own admission: "During analysis, expansion was determined to be necessary to support *this and future projects* in the area." AR 08191 (Decision Memorandum).[6] Plaintiffs assert that this last phrase is a smoking gun and reveals the Forest Service's true intentions: it wants to expand the gravel pit for future projects, but didn't want to perform any environmental analysis under NEPA, so the agency threw it in with the Windy-Shingle Project.

---

[5] Available at https://www.forestsandrangelands.gov/documents/resources/plan/11-23-en.pdf.

[6] The administrative record in this case is voluminous. It is not found on the docket but was provided to the Court and Counsel on a flash drive with a ledger. Dkt. 14. The Court refers to the administrative record in the same manner as the parties (i.e. to the "AR" itself rather than a docket citation) but will give a brief description of each document cited for the readers' benefit.

Additionally, Plaintiffs contend that the express statutory language, as well as the 2014 Farm Bill itself, does not mention or provide authority for an activity like gravel pit expansion. "The doctrine of expression *unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005). Here, Congress has expressly authorized limited projects to land of a certain size, type, and in certain locations, as well as specifying "appropriate tools" for such "authorized hazardous fuel reduction projects." Importantly, within the 2014 Farm Bill, Congress placed limits on the activity of road construction. When utilizing the 2014 Farm Bill's authority to exempt a project from NEPA review, an agency may not construct permanent roads and must decommission any temporary roads within three years of project completion. 16 U.S.C § 6591b(c)(3). These are the only activities Congress has expressly provided for outside of using "appropriate tools" to reduce "hazardous fuels."

At the outset, the Forest Service rejects the assertion that it buried this expansion in the Windy-Shingle Project to get it approved. Furthermore, the Forest Service notes that HFRA allows the Forest Service to "carry out necessary maintenance and repairs on existing permanent roads." 16 U.S.C. § 6591b(c)(3)(A)(ii). In their view, Plaintiffs are unnecessarily narrowing the exception by claiming that any action must directly *reduce hazardous fuels.* Contrary to this assertion, Defendants posture that the repair of roads is inherent in projects like this and of necessity must be allowed. The Forest Service describes that even under Plaintiffs "Congressional limits" argument, its expansion and maintenance

is within compliance because it is not constructing new roads and plans to decommission all temporary roads within the proscribed timeframes. Finally, the Forest Service makes clear that the Forest Service Handbook requires the use of "economically available materials" for road aggregate surfacing material and that the McClinery pit provides a local source of aggregate, which translates into lower costs and eliminates the need for longer gravel haul distances. Forest Service Handbook 7709.56, ch. 47.2.6. Though somewhat unrelated, the Forest Service also claims that under the public notice requirements of HFRA, it provided the public with an opportunity to comment on this issue and because no opposition was raised at that time, Plaintiffs are being myopic in their analysis and just trying to thwart the project by any means possible.

In response to the Forest Service's explanation, Plaintiffs assert that "maintenance and repair"—as found in HFRA—does not include an "open-pit mine" that is "sometimes used in the activity of maintaining roads" and that Defendants are attempting to "bootstrap mining activities within a national forest." Dkt. 19, at 2–3. Plaintiffs argue that while the phrase "maintenance and repair" is never defined in HFRA, it is not ambiguous nor open to interpretation, and "cannot reasonably encompass" the activities contemplated for by the Forest Service. *Id.* at 4. Plaintiffs assert that were the Court to accept this "one thing leads to another" definition, it would result in the inevitable finding that anything remotely related to roads (such as culverts, bridges, and, importantly, harvesting the materials needed for such builds) is included in the definition of "maintenance and repair." Plaintiffs also highlight the word "necessary" in the statute and note that the Forest Service has identified another source of aggregate in the area—indicating it *could* comply with the law

in a less intrusive manner, but simply does not want to. The Court disagrees.

First, Plaintiff's slippery slope argument—while understandable—is not persuasive to the Court in this case. The maintenance, repair, and temporary construction of roads is not as far removed from the purposes of HFRA as Plaintiffs suggest. In order to achieve any of the objectives of their authorized hazardous fuel reduction project—prescribing fires, using wildland fires, crushing, tractor and hand piling, thinning, and pruning—the Forest Service must have access to those areas in need—access typically only roads can provide.

Second, as will be a repeated theme throughout this decision, it is critical to distinguish between *what* the statutory requirements are and *how* the Forest Service carried out those requirements. For example, Plaintiffs do not dispute that road maintenance is allowed under HFRA, however, they dispute how the Forest Service plans to do that in the Windy-Shingle Project. Such a question, however, is not for Plaintiffs (nor the Court) to decide—absent clear misbehavior.

At the outset, the Court notes that the Plaintiffs' preference for another source of aggregate—even one the Forest Service has identified as a viable alternative but for the distance and added costs—is not an adequate basis for vacating the Forest Service's decision to implement the Windy-Shingle Project and use the McClinery pit. *River Runners*, 593 F.3d at 1070 ("The APA does not allow the court to overturn an agency decision because it disagrees with the decision. . . ."); *McNair*, 537 F.3d at 987 (noting that a court must "not substitute [its] judgment for that of the agency").As outlined above, the Forest Service need only articulate a "reasonable basis" for using the McClinery gravel pit

as the source of aggregate for carrying out necessary road maintenance and repairs and show that this activity falls within the confines of HFRA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Nw. Ecosystem All.*, 475 F.3d at 1140. Here, the Forest Service has done just that.

The Forest Service analyzed the consequences of reactivating the McClinery pit in reports included in the administrative record. *See, e.g.,* AR 07495-96 (Wildlife Report detailing the effects of using the McClinery Pit on wildlife); AR 05413-15 (Soil Resources Worksheet discussing soil concerns and conservation regarding road construction and the McClinery Pit). These various reports demonstrate that the Forest Service's decision to use the McClinery gravel pit was reasonable; the Court is loath to call that determination into question absent compelling evidence demonstrating such a course of action was arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A) (Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"). *See also Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983) ("It is not our task to determine what decision we, as [the agency], would have reached. Our only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made."). Additionally, while the Windy-Shingle Project does expand the McClinery Pit to some degree, it also contains mitigation and reclamation measures to reduce the effects of the site.

Plaintiffs offer little in the way of evidence to support their proposition that the Forest Service's decision to use the McClinery gravel pit for the Windy-Shingle Project's necessary road maintenance and repair was arbitrary or capricious. As noted, Plaintiffs do

not disagree that HFRA allows the Forest Service to "carry out necessary maintenance and repairs on existing permanent roads . . . ." 16 U.S.C. 6591(b)(3)(A)(ii). Plaintiffs simply disagree that the McClinery Pit can be expanded to further this approved task.

It seems apparent, however, that an agency may need to undertake some ancillary tasks (such as using or expanding a gravel pit) to further an appropriate and statutory function (maintaining roads) to ultimately comply with its "forest resilience project" to "reduce hazardous fuels" under HFRA. Moreover, where, as here, the agency conducted an examination and review of the impact of these actions, it can hardly be said the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). *See also, Nw. Ecosystem All.*, 475 F.3d at 1140 (Courts must "affirm[] the agency action if a reasonable basis exists for its decision").

In sum, Plaintiffs have not met their burden in establishing that the Forest Service's decision to expand and use the McClinery gravel pit in furtherance of the Windy-Shingle Project was arbitrary and capricious. While they may disagree with its use, such is not enough under the APA. Defendants' use of the McClinery gravel pit for necessary maintenance and repair of roads is an acceptable use under HFRA's insect or disease categorical exclusion. Plaintiff's Motion for Summary Judgment on Claim One is DENIED. Defendants' Motion for Summary Judgment on Claim One is GRANTED.

2. *Designated Old Growth (Claim Two)*

Second, Plaintiffs move for Summary Judgment on their claim that the Project does not maximize the retention of old-growth and large trees—a violation of NFMA and HFRA.

Under HFRA, Projects must be carried out "in a manner that maximizes the retention of old-growth [habitat] and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591a(e). The Nez Perce Forest Plan defines old-growth habitat as "[a] community of forest vegetation which has reached a late stage of plant succession characterized by a diverse stand structure and composition along with a significant showing of decadence" resulting from "forces of nature" that include "insect [and] disease . . . ." AR 08427 (Nez Perce Forest Plan Glossary).

Specifically, under the Nez Perce Forest Plan and regional guidelines for old-growth, old-growth stands generally contain: (1) at least 15 trees per acre that are greater than 21 inches diameter at breast height; (2) two or more canopy layers; (3) at least 0.5 snags (standing dead trees) per acre that are greater than 21 inches diameter at breast height and at least 40 feet tall; (4) signs of rot and decadence; (5) overstory canopy closure between 10 and 40 percent, understory canopy closure of at least 40 percent, and total canopy closure of at least 70 percent; and (6) logs on the ground. AR 08477 (Appendix N-1).

The Old-growth Management Standards define "old-growth" criteria, and Standard A-2 (Identification and Designation of Old-Growth Stands) includes the following mandatory procedures for identifying, and ensuring the viability of, old-growth species:

- Old-growth stands will be identified through the use of stand exam information, aerial photos, and field reconnaissance.
- All stands will be inventoried and prioritized with highest priority for inventory in those drainages with proposed timber sales or other activities that could adversely impact old-growth.

• Verify the quality, amount, and distribution of existing and replacement old-growth habitat as part of project planning.

AR 08478 (Appendix N-2). Where only five percent old-growth exists in a drainage, stands are to be managed as old-growth. *Id.* Where more than 5 percent exists, the stands to be protected are to be selected based on a priority ranking, *with the highest priority stands retained first*. *Id.* This is the Nez Perce Forest Plan's equivalent of the Farm Bill's "maximizing the retention of old-growth" provision. 16 U.S.C. § 6591a(e). Put simply, for purpose of ensuring the viability of old-growth species consistent with forest plan standards, the Forest Service needs to maximize the retention of the highest priority old-growth stands in the project area.

In this case, Plaintiffs allege that the Forest Service has not complied with its own plan and that it violated the procedures that must be utilized when determining "old-growth." Plaintiffs' argument boils down to this: the Forest Service failed to consider relevant factors in deciding what stands qualified as "old-growth" and its actions are inconsistent with its own plan—specifically Appendix N of the Nez Pearce Forest Plan.

Defendants begin by noting that a forest plan such as theirs defines "broadly the uses allowed in various forest regions [and sets] goals and limits on various uses . . . but do[es] not directly compel specific actions." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). While site-specific projects must be consistent with the forest plan, "the Forest Service is entitled to deference to its interpretation of its own Forest Plan, unless the interpretation is plainly inconsistent with a Forest Plan." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d at 1013 (internal quotations and citations

omitted).

In this case, Appendix N directs how the Forest Service must identify and designate old-growth stands. AR 08477-79; *see also,* AR 06508-09 (Project vegetation report explaining identification and designation of old-growth stands in the Project area). As part of the Forest Service's analysis for the Project, the Agency conducted a rigorous assessment of available information on old-growth and large trees in the Project area. The record contains almost a thousand pages of raw data about basic stand characteristics in the Project area. AR 05749-6362 ("Stand Reports" and "Tree Data Forms"); AR 6537-6838 ("Old-Growth Reports").

This aside, Plaintiffs assert that the Forest Service violated its own plan and old-growth management standards by failing to priority rank old-growth stands, by relying on old data and limited field work, and by changing boundaries in areas designated as MA-20 for timber sale. The Court will address each argument in turn.

a. Ranking

NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1185 (9th Cir. 2008). Consistent with this purpose, a court must be able to reasonably discern for itself, from the project record and not for the first time in litigation, that the Forest Service has complied with applicable forest plan's standards. *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961–62 (9th Cir. 2005).

The Nez Perce Forest Plan requires that "[a]ll stands will be inventoried and prioritized with highest priority for inventory in those drainages with proposed timber sales or other activities that could adversely impact old-growth." AR 08478 (Appendix N-2). The plan further explains that:

> Old-growth stands will be identified through the use of stand exam information, aerial photos, and field reconnaissance. Stands will be prioritized on the basis of how many of the six criteria listed under "Definitions" are met, size of stand, presence of roads, age class of surrounding timber (e.g. clear cut vs. mature) and known or suspected use by the old-growth indicator species.

AR 08478 (Appendix N-2).

In this case, the Forest Service explains that it prioritized its inventory by reviewing all relevant data and identifying all stands that may have old-growth attributes in accordance with the Forest Plan's directive. AR 06387-89 (identifying and outlining proposed treatments in Windy-Shingle units), AR 07334 ("old stand exams" spreadsheet). The Forest Service goes on to describe that generally, priority for stands to be inventoried is based on whether the stands have exam information already available. *See* Forest Service Handbook 2409.17 ch. 80.1; Forest Service Manual 2470 ch. 2478.1. Stands without exam information are given priority and thus will be inventoried before stands that have exam information. *See id.* Stand inventories are prioritized across the forest and are based on where the forest may be conducting vegetation management activities. *Id.* The Forest Service prioritized its inventory by reviewing all stands that had old-growth attributes in accordance with the Forest Plan's directive. *See* AR 07334 ("old stand exams" spreadsheet). The Forest Service then provided a stand-by-stand description of treatments.

AR 07769-75 (Forest Vegetation Report – old-growth retention stand summaries).

Here, Plaintiffs do not appear to dispute that the Forest Service actually identified and prioritized for inventory the old-growth stands as required, but rather *how* the Forest Service identified and prioritized that inventory. Specifically, Plaintiffs contend that the Forest Service must produce a list individually ranking the old-growth stands.

Plaintiffs discuss at length their perceived definition of the terms "prioritized" and "ranking" (as outlined in the old-growth standards of the Nez Perce Forest Plan) and that a list prioritizing stands of old-growth is the best way to do this. The fact remains, however, that no such requirement—that of a ranked list—exists anywhere. Furthermore, Plaintiffs offer no authority to support the proposition that the Forest Service must produce an actual "list."

While Plaintiffs may prefer a different format (in the form of a ranked list) to show identification and prioritization for inventory of old-growth, their preference does not mean that the Forest Service's compliance with its own Forest Plan is arbitrary and capricious. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012); *Wildlands Def. v. Seesholtz*, No. 1:17-CV-408-BLW, 2017 WL 5473451 at *3 (D. Idaho Nov. 14, 2017) ("Plaintiffs take issue with this interpretation of the Forest Service regulations, but the agency's 'interpretation and implementation of its own forest plan is entitled to substantial deference.'" (citing *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013))).

In short, it is not enough that Plaintiffs disagree with *how* the Forest Service inventoried and prioritized old-growth retention; it must show that the Forest Service did

not do this at all and/or acted in a manner inconsistent with the overall forest plan when it did. Here, in the absence of a "list" requirement, the Court cannot accept Plaintiffs' argument that the Forest Service's failure to utilize one is somehow arbitrary or capricious.

Each of the requirements outlined in the Nez Pearce Forest Plan are part of the *methodology* of determining and preserving old-growth, but there is no mandate that they be carried out in a particular fashion. The Forest Service has clearly undertaken measures aimed at these goals—again, the record contains thousands of pages of stand exams, treatments, and summaries. The fact that the Forest Service did not then turn this data into a final list is of little significance. As the Forest Service explained, per its Handbook, stands without information available are given priority over stands with existing data. The Forest Service did this—utilized stand information that was available to them, but also conducted stand exams to supplement and update the information it had. That in itself is one way in which the Forest Service "prioritized" the stands for inventory.

Furthermore, the Forest Service created other reports that—while not ranking stands in a list as Plaintiffs suggest—outline stands where significant work needs to be done. *See e.g.,* AR 06508-15 (outlining priority treatment areas, stand analysis, and old-growth criteria); AR 05717-22 (discussing the designation of MA-20 areas and how that will maximize stands and old-growth).

In short, while the Forest Service could have potentially made their results more "reader-friendly" by creating a list or numerical ranking of some type, such is not a specific requirement and the record reflects that the Forest Service performed tasks sufficient to meet the Nez Perce Forest Plan's mandate to identify and prioritize old-growth stands.

The Court is not persuaded by Plaintiffs' argument on this issue.

### b. Field Reconnaissance

As part of the prioritization process, the Plan first requires that the Forest Service perform field reconnaissance—in conjunction with reviewing stand information and aerial photos—to determine which stands qualify as old-growth. Plaintiff's contend that the Forest Services' actions come up short—procedurally and substantively.

#### i. Plaintiffs' Objection to Form/Procedure

Plaintiffs first contend that the Forest Service failed to perform any field reconnaissance in its determination of which stands qualified as old-growth. The Forest Service rejects this argument and points to the administrative record and the numerous references to "field sampled vegetation," "field site visits," "field examinations," and "field surveys." *See, e.g.*, AR 06483 (Vegetation Report—specifically noting that "during the planning for this project, field site visits were made to all the areas proposed for treatment as well as many other stands in the project area that were not included into the proposed action for treatments."); AR 07487-674 (Wildlife Report), AR 08185-256 (Decision Memorandum).

In their reply memorandum to their motion for summary judgment, Plaintiffs retreat slightly from this original position and admit that "while the examples cited demonstrate the Forest Service actually did visit some areas, no example cited demonstrates that the visit occurred specifically to verify old-growth stands for the purpose of ranking or prioritizing the highest quality old-growth habitat." Dkt. 19, at 16. Additionally, Plaintiffs appear to fault the Forest Service for not using the precise term "field reconnaissance" in

the Vegetation Report or Decision Memorandum. Dkt. 16, at 17.

Again, as above, Plaintiffs are focusing on form over substance. As to the first matter, Plaintiffs do not provide any authority for the proposition that the Forest Service was required to specifically state that any particular field visits' purpose was to verify old-growth stands. Additionally—as to both issues—the Plan only requires that the Forest Service *incorporate* field reconnaissance into its procedure for identifying and designating old-growth stands; however, the Plan does not specify how much reconnaissance is necessary or the format in which the Forest Service should organize its field reconnaissance data. AR 08478 (Appendix N-2).

Importantly, the Forest Service does not need to use specific phrases, or "magic words," from the Forest Plan to demonstrate compliance with the Plan itself. *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 341 F. Supp. 3d 1217, 1232 (W.D. Wash. 2018), *appeal docketed*, No. 19-35065 (9th Cir. Jan. 29, 2019) (determining that where a "requirement [was] not very specific, [] the Forest Service has the discretion to interpret it reasonably"); *see Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) ("Although this evidence is not presented in [a particular] section of the EA, it would impermissibly elevate form over substance to hold that [the agency] must replicate its entire analysis under [a specific] heading").

In this case, the Court is "loath to engage in a 'magic words review,' where the propriety of the [agency's] analysis hinges on whether it included the correct words in its [administrative record], rather than whether its analysis carried the substantive weight arbitrary and capricious review demands." *Wilderness Watch, Inc. v. Creachbaum*, 225 F.

Supp. 3d 1192, 1207 (W.D. Wash. 2016), *aff'd*, 731 F. App'x 709 (9th Cir. 2018). Plaintiffs seek to hold the Forest Service to an undefinable standard.[7] Plaintiff's objections beg the question: what would be sufficient in each of these circumstances? Arguably, the Forest Service could have done more than it did here, but even then, Plaintiffs may still have objected requesting the Forest Service do even more. The discretion of interpretation is often one-sided, but deference must be given to an agency's reasonable interpretation of its own policies, procedures, and plans; to do otherwise would allow adversarial parties to endlessly argue what is sufficient compliance with no true metric.

In short, Plaintiffs may fundamentally disagree with the scope, or even the breadth, of the Forest Service's field reconnaissance, but the Forest Service has the discretion to interpret and implement its Plan in a reasonable manner. The Court has reviewed the administrative record and finds that the Forest Service performed field reconnaissance in many different forms and considered those findings as part of its prioritization of old-growth stands.

*ii. Plaintiffs' Objection to Substance*

Second, Plaintiffs also object to certain data the Forest Service used alleging that the information is "stale" because it is more than three decades old (from 1981–1985). AR 07334-35; AR 07343-45 (old-stand exams spreadsheets). There are two problems with this argument.

_____

[7] *See, e.g., Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009) (finding that "the language [of the plan] at issue here does not create a mandatory standard. We have repeatedly noted that the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations" (internal quotations and citations omitted)).

First, this argument appears to misconstrue the contents of the administrative record. As explained above, the Forest Service used—and updated as necessary—stand exam information to identify the amount and quality of existing (and replacement) old-growth within the Project area. Yes, the Forest Service used data from 1981, 1982, 1984, 1986, 1991, and 1992. *See generally* AR 07335-54. But it also used data from 2008, 2010, 2012, and 2016. *Id.* The most recent stand exams, for example, were conducted in 2016 and supplemented the Forest Service's existing data from the 1980s and 1990s. *See also* AR 05642-79 (summarizing data collected in 2016).[8]

Second, the fact that some of the data is "old" does not mean that the data is unreliable. The Forest Service has wide latitude to decide how best to demonstrate that projects comply with the governing Forest Plan. *Lands Council*, 537 F.3d at 992. Here, the Forest Service relied on existing stand information and supplemented or updated that information as appropriate. Determination of what constitutes the best available scientific information implicates agency expertise and is entitled to substantial deference. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (*quoting Kleppe v. Sierra Club*,

---

[8] Additionally, Plaintiffs claim that some of the reports in the record—specifically AR 07340-42—are smoking guns because the report indicates "no surface data [was] collected" in some areas that were updated in 2016. Other 2016 updates, however, indicate "surface data [was] collected." Furthermore, AR 05642-79 are specific forms detailing "Plot Data," "Tree Data," "Down Woody Material," and "Vegetation Composition Data." Undoubtedly, individuals had to be in the field in order to collect this data. Again, while the Forest Service *could* have potentially done more, there is no indication such was necessary and it is not the Court's prerogative, or Plaintiffs' opportunity, to cast doubt on that decision absence specific malfeasance.

427 U.S. 390, 412 (1976)). Critically, Plaintiffs have not cited any information, authority, or studies illustrating that the Forest Service's stand exam information (old or new) is erroneous or unreliable. *See Castaneda*, 574 F.3d at 659 (finding defendants had "not cited any scientific studies that indicate the Forest Service's analysis is outdated or flawed," but that even if they had "it is not our [the Court's] role to weigh competing scientific analyses").

Instead, Plaintiffs contend—without any legal or factual support—that the Forest Service's analysis was "simply not good enough." Dkt. 19, at 14. As already explained, however, while Plaintiffs may prefer a different method for identification and verification of old-growth stands, this preference does not show that the Forest Service's procedures were arbitrary and capricious under the APA's deferential standard of review. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

For these reasons, the Court finds this argument by Plaintiffs unpersuasive as well.

### c. MA-20 Designations

Third, and finally, the Nez Perce Forest Plan prohibits timber harvest on certain forest lands classified as old-growth management areas, or "MA-20" areas" AR 08352-53 (Nez Perce Forest Plan). A forest plan may "be amended in any manner whatsoever after final adoption . . ." as long as such changes are in accord with NEPA. 16 U.S.C. §1604(f)(4). If, for example, the Forest Service were to determine through field reconnaissance that a certain MA-20 forest was no longer serving old-growth species needs, and better habitat was available, it could amend the forest plan to reflect those changed conditions. In the past, the Forest Service has done just that as part of timber

harvest projects. *See, e.g.*: AR 08569-71 (Amendments to the Nez Perce Forest Plan. (specifically, Amendments 17, 22, 25, and 32 allow for timber harvest in MA-20 areas following certain events (such as fires) and after further management analysis)).

Here, Plaintiffs point to the Forest Service's Decision Memorandum, where it stated that "[h]arvest activities will occur within Forest Plan MAs 10, 12, 16, and 17" and that "[t]his project is consistent with all applicable . . . standards . . . ." Dkt. 16-1, at 19 (*citing* AR 08204 (Decision Memorandum)). There is no mention anywhere in the record of harvesting in any MA-20 areas.

According to Plaintiffs, however, the Forest Service maps created in November of 2016 clearly indicate there will be timber harvest in MA-20 areas. Upon review, it does appear that the Forest Service originally intended to include MA-20 old-growth habitat areas in certain cutting units—identified as unit 5 and B5. Cutting unit B5 was subsequently dropped, while cutting unit 5 was approved for harvest after it was split into cutting units 5B and 5C. A later prepared map (created on May 11, 2017) of MA-20 habitat excludes cutting units 5B and 5C from MA-20 designated areas entirely. AR 07332 (MA-20 designation map).

Plaintiffs claim that there is no suggestion anywhere in the Decision Memorandum or the Forest Vegetation Report as to why the Forest Service dropped the MA-20 designation in this area when proposed cutting unit 5 was split up into cutting units 5A, 5B, and 5C (5A does not appear to have ever been within an MA-20 area). Nor was a Forest Plan amendment proposed to change the designation of permit timber harvest in the "validated" MA-20 stands indicated on the November 4, 2016, map. Plaintiffs therefore

conclude that the Forest Service's decision to log in these MA-20 areas is inconsistent with the forest plan, and furthermore, that it violates the 2014 Farm Bill.

The Forest Service begins by explaining that the Project does not propose to harvest, conduct prescribed burns, or construct temporary roads within any mapped MA-20 stands in the Project area and that while the Project proposes treating some old-growth stands— for example with regeneration cuts—none of these stands have been designated as MA-20. AR 07601-09 (Wildlife Report). The Forest Service also clarifies that some unmapped inclusions of MA-20 may occur in certain treatment units, but that these areas will be managed as old-growth and if the unmapped inclusions are harvested, silvicultural prescriptions (which are categorical exceptions under 16 U.S.C. § 6554(d)) will maximize the retention of old-growth and large trees in accordance with the Forest Plan. AR 08265 (Management Areas summary).

As for Plaintiffs' argument that some of the boundaries mysteriously changed, Defendants point out that the Nez Perce Forest Plan provides guidance for the 26 "management areas" designated on National Forest System lands. AR 08297-364 (Nez Perce Forest Plan – Management Area Direction). Each management area has its own set of goals, resource potentials, and limitations and is distinguished by how its boundaries are defined. *Id.* The first type of management areas, such as those for special administrative areas (active mining areas, campgrounds, etc.) or Congressionally-established areas (Wild and Scenic River corridors, wilderness) have legally established or well-defined boundaries. *Id.* The second type of management areas designated by the Forest Service do not have precise boundaries. *Id.* In fact, the boundaries may overlap and are "flexible to

assure that the values identified are protected and to incorporate additional information gained from further on-the-ground reconnaissance and project level planning." AR 08297. MA-20 areas fall into the second grouping and do not have precise boundaries. It is "manage[d] for old-growth habitat for dependent species" based on the capability of the stands to produce suitable habitat for old-growth dependent species. *See* AR 08300; AR 08352. Timber harvest activities within MA-20 stands are generally prohibited, unless an exception is added by amending the Forest Plan. AR 08353.

Plaintiffs' argument that the Project does not authorize timber harvest in MA-20 rests on their assumption that MA-20 boundary lines are fixed, however, as just explained, this assumption is incorrect. MA-20 designations are flexible. Rather than having set boundaries, MA-20 stands are designated anywhere within a prescription watershed or old-growth analysis area as a means to ensure retention of appropriate amounts of old-growth— in other words, their purpose (as opposed to their boundaries) is the focus and can change as circumstances change. *See* AR 07601 (Wildlife Report).

So, while it does appear that the maps created in November of 2016 designated MA-20 stands in cutting units 5B and 5C, the final designation of MA-20 areas does not overlap with these cutting units. AR07332. Furthermore, even if the Forest Service "changed" the boundaries, such is allowed because MA-20 designations are fluid. They are set out for a specific purpose—their capability to produce suitable habitat for old-growth dependent species—and if a stands capability to meet that purpose changes, its boundaries may change.

Courts defer to the Forest Service's interpretation of the Forest Plan's management

area designations. *See Native Ecosystems Council,* 418 F.3d at 960 ("Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans." (citing *Forest Guardians*, 329 F.3d at 1097)); *Weldon* 697 F.3d at 1056 (9th Cir. 2012) ("[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference.").

The Forest Service's interpretation of its own plan is reasonable, and the Court finds that the designation of MA- 20 stands (even under changing circumstances) in the Decision Memorandum is consistent with the Forest Plan and, thus, NFMA. *See Helena Hunters & Anglers v. Tidwell*, 841 F. Supp. 2d 129, 1141 (D. Mont. 2009) (upholding Forest Service's decision to implement a project because the Forest Service "advanced a reasonable interpretation" of the Forest Plan).

The Court turns briefly to Plaintiffs' claim that the Forest Service must amend the Forest Plan if it wants to allow timber harvest in existing stands designated as MA-20. This argument is without merit. To support this assertion, Plaintiffs rely solely on the fact that the Forest Service previously amended the Forest Plan to include specific timber management projects within MA-20 designated areas. This argument misses the point: what the Forest Service did or did not do in the past may be relevant and important, but it is not necessarily binding on them today. Plaintiffs do not point to anything—in the Memorandum Decision, the Forest Plan, the administrative record, or caselaw—that requires a formal amendment process for timber harvest in MA-20 (or previous MA-20) areas.

The primary question is not whether MA-20 boundaries changed or even whether

the Forest Plan was amended, but whether the Forest Service properly *analyzed* the MA-20 designations by *following* the Forest Plan standards for old-growth. The administrative record shows that the Forest Service did that and is appropriately managing MA-20 areas for old-growth habitat based on the capability of the stands to produce suitable habitat for old-growth dependent species. The Court finds that the Forest Service properly assessed and designated MA-20 stands in the Project area and need not make these decisions known through official amendments to the plan—even though that is how the agency approached similar changes in the past.

Finally, Plaintiffs conclude their section on old-growth by claiming that "the Farm Bill [categorical exclusion] is a disease and insect treatment [categorical exclusion], not an old-growth logging [categorical exclusion]." Dkt. 19, at 21 (emphasis removed). Plaintiffs assert, without providing support, that "[o]ld growth habitat is the healthiest forest there is." Dkt. 19, at 22. While this may be true in some circumstances, the administrative record in this case shows that insect and disease are a problem throughout the Project area, including some stands that may meet Forest Plan old-growth standards. *See e.g.*, AR 05719 (identifying bark beetles, dead trees, and root disease in some old-growth stands), AR 06387-89 (identifying units with old legacy trees and mistletoe and/or fungal infestations); AR 07605 (noting that some old-growth habitats are "rapidly declining from the assault of insect and diseases"), AR 08186 ("[s]tand surveys indicate root rot, bark beet and mistletoe-induced mortality and decay at varying levels throughout the proposed treatment areas."). Even in these areas, the Forest Service has explained that it will retain as many large trees as appropriate. *Id.* HFRA's insect and disease categorical exclusion allows this,

because the requirement to maximize retention of old-growth and large trees is qualified, "as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A).

Thus, Plaintiffs' argument that the 2014 Farm Bill prohibits the removal of any old-growth is misplaced. Appropriate management of a forest may include the reduction of old-growth. *See Erickson*, 330 F. Supp. 3d at 1245 ("HFRA does not require that all healthy large trees be retained . . . the statute calls for the exercise of Forest Service expertise in determining what is appropriate to maximize retention." (citation omitted)); *see also Marten*, 2018 WL 6046472, at *7 ("Plaintiffs' insistence that no old-growth can be removed under HFRA is not consistent with the statute . . . .")).

Here, the Court finds no error or arbitrary actions in the Forest Service's determination and designation of MA-20 areas.

Having considered each of Plaintiffs' arguments, the Court finds that Defendants substantially complied with the Forest Plan, and all applicable NFMA and HFRA requirements. Plaintiffs' Motion for Summary Judgment on Claim Two is DENIED. Defendants' Motion for Summary Judgment on Claim Two is GRANTED.

### 3. Supplemental Analysis (Claim Three)

Plaintiffs do not ask for summary judgment on this claim and Defendants assert that it is therefore waived. Dkt. 17, at 6. The Court inquired of Plaintiffs at oral argument as to whether they were pursuing this claim. Plaintiffs indicated they were not. Accordingly, Summary Judgment on Claim Three is GRANTED in favor of Defendants.

**B. Motion to Supplement Extra-Record Evidence**

In conjunction with the filing of their Response brief (Dkt. 19), Plaintiffs filed a Motion to Supplement Extra-Record Evidence (Dkt. 20). In this Motion, Plaintiffs ask the Court to admit and consider evidence *not* contained in the administrative record, specifically the Declaration of Gary Macfarlane and Exhibits A, B, C, and D to his declaration. Gary Macfarlane is apparently an employee of Plaintiffs who previously worked for the Forest Service. Plaintiffs contend that his declaration and attached exhibits will aid the Court in understanding that—contrary to the Forest Service's assertions—Appendix N of the Nez Perce Forest Plan 1) *requires* that the agency conduct on-the-ground data collection for old-growth; 2) *requires* the agency to rank old-growth stands; and 3) *does not* allow for original MA-20 designations to be fluidly moved and opened to logging without a Forest Plan amendment.

Judicial review of the actions challenged in this case is governed by the APA, which provides that "the court shall review the whole record or those parts of it cited by a party," and makes no provision for extra-record review. 5 U.S.C. § 706; *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (stating that "review is to be based on the full administrative record" that was before the *agency* at the time of its decision), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Both the Supreme Court and the Ninth Circuit have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Sw. Ctr. For Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1450 (9th Cir.

1996). While Plaintiffs may submit declarations for the purpose of establishing standing, *see Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527 (9th Cir. 1997), "consideration of extra-record evidence to determine the correctness . . . [or] wisdom of the agency's decision is not permitted." *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1144 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

The Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case only under four narrow exceptions:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter . . . [or (4)] where plaintiffs make a showing of agency bad faith.

*Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (internal quotation marks and citations omitted). Plaintiffs bear the burden of demonstrating with particularity that the extra-record evidence they proffer in this case falls within one of the enumerated exceptions. *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988) opinion amended by 867 F.2d 1244 (9th Cir. 1989). The limited exceptions are "narrowly construed and applied." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

Here, Plaintiffs move to admit Macfarlane's declaration and exhibits solely under the first exception, which allows a court to consider extra-record material that is "necessary to determine whether the agency has considered all relevant factors and has explained its decision[.]" *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (internal quotation marks

and citation omitted).

The "relevant factors" exception only applies where supplementing the record is necessary to allow judicial review. Where "[t]he record contains sufficient information to explain how the [agency used the information before it] and why it reached its decision[,]" the exception does not apply. *Cook Inletkeeper v. EPA*, 400 Fed. App'x 239, 240–41 (9th Cir. 2010). Courts may admit evidence under this exception "only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious. But reviewing courts may not look to this evidence as a basis for questioning the agency's scientific analyses or conclusions." *San Luis & Delta- Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014); *Weldon*, 232 F. Supp. 3d at 1149 (denying extra-record declarations because "[t]hey do not support the proposition that the agency failed to consider relevant factors, but rather that its consideration of those factors was scientifically unsound.").

Specifically, in this case, Plaintiffs contend that the Court should consider this material because "there is a hole in the record . . . because the Forest Service has ignored, without explanation, clearly applicable forest-plan standards regarding the agency's obligations regarding old-growth under the Nez Perce Forest Plan." Dkt. 20, at 4. However, Defendants object to the timing of Plaintiffs motion, alleging that it was filed in violation of their mutual agreement to resolve any issues with the administrative record by March 1, 2019, and in violation of the Court's scheduling order adopting the same.

Defendants argument is misplaced, however, because this is not a motion to supplement the record, but a motion to admit extra-record evidence. Admitting extra-record

evidence is entirely distinct from supplementing the administrative record. "Supplementing the administrative record" means "adding to the volume of the administrative record with documents the agency considered . . . ." *Pacific Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006). Such a motion would have to have been brought within the aforementioned timeframes. Introducing extra-record evidence, however, is "viewing evidence outside of or in addition to the administrative record that was not necessarily considered by the agency." *Pacific Shores*, 448 F. Supp. 2d at 5. A party could arguably bring a motion on this basis at any time—or at least when the material became known to the them. Accordingly, the Court is not concerned with the timing of the motion and dismisses Defendants argument on this point.

Substantively, however, the Court is not persuaded by Plaintiffs extra-record submissions.

To briefly summarize, these submissions describe the process and methodology utilized in two prior timber sales for identifying old-growth stands, specifically the fieldwork and priority ranking involved, as well as evidence of how MA-20 areas purportedly cannot be designated for harvest. The Court has two problems with these materials. First, these materials represent a former employee's opinions and interpretations of requirements within the Forest Plan. Taking aside the fact that Plaintiff now employs this very individual, there is no indication that his interpretation is binding on the Forest Service. Second, just because this is how the Forest Service did things in the 1990s, does not mean that 1) it was required and appropriate then and/or 2) that it must abide by those same procedures now.

And while Plaintiffs claim that they are not submitting this evidence to "suggest what methodology the agency should use," they admit that the declaration and all four exhibits illustrate that "the Forest Service must actually send people into the field to verify what they have determined might be old-growth, evaluate that old-growth and rank it . . . ." Dkt. 20, at 8. So contrary to their assertions otherwise, Plaintiffs *are suggesting* what the Forest Service should have done in this case—based on what they did in the past—to more properly comply with the governing forest Plan. The Court has two additional problems with this explanation.

First, courts have repeatedly held that this exact type of information does not satisfy the first narrow exception that allows a court to consider extra-record material. *Nw. Envtl. Advocates*, 460 F.3d at 1144 ("[C]onsideration of extra-record evidence to determine the correctness . . . [or] wisdom of the agency's decision is not permitted." (alterations in original) (internal quotation marks omitted)); *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993; *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1146 (D. Nev. 2015) (striking extra-record declaration that proffered 'critiques of the agencies' selected methods"); *Greater Hells Canyon Council v. Stein*, No. 2:17-CV-0843- SU, 2018 WL 3966289, at *6 (D. Or. June 11, 2018) (denying extra-record evidence because "plaintiffs' submissions are an attempt to provide an alternate and preferred version of the facts in order to persuade the Court that the Forest Service's decision was in error. This is precisely the type of extra-record evidence that the court may not consider."), *report and recommendation adopted*, 2018 WL 3964801 (D. Or. Aug. 17, 2018), *appeal docketed*, No. 18-35742 (9th Cir. Sept. 5, 2018); *Burnside v. Office of Navajo*, No. CV-15-8233-PCT-PGR, 2017 WL 4284576, at

*8 (D. Ariz. Sept. 27, 2017) (denying extra-record evidence submitted in support of plaintiffs' "legal argument that the [agency] failed to follow its own Revised Policy 9, its prior interpretations of that policy, and its past decisions under that policy.").

Second, Plaintiffs' allegations that this material provides context proving that the Forest Service has "completely deviated from the Plan's mandates," (Dkt. 24, at 2), or that the Exhibits prove "what form specific compliance takes," (Dkt. 24, at 4) is faulty at best. The Court is not calling Macfarlane's credibility into question, but the fact that these declarations may show what form specific compliance took *at one time* (or that the Forest Service has "deviated" from practices it used in the early 1990s), does not necessarily show that the agency has deviated from actual Plan requirements or violated the NFMA in regard to the Windy-Shingle Project. "While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1056 (*citing Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003)). A single former employees' recollection of how things were done in the past does not prove wide-scale deviation and improper behavior under the Plan in the present action.[9]

The Court finds the extra-record documentation does not help the Court "determine whether the agency has considered all relevant factors and has explained its decision" under the sole exception Plaintiff utilized to present this evidence to the Court. Accordingly,

---

[9] Underlying this argument is the assumption that the prior method of doing things was in compliance with the Plan in the first place. This may, or may not, have been true. The Court does not know.

Plaintiffs' Motion is DENIED.

## V. CONCLUSION

In a case such as this, the Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.* 753 F.2d at 769. Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The Court must "not substitute [its] judgment for that of the agency." *McNair*, 537 F.3d at 987. "The agency's action need only be a reasonable, not the best or most reasonable, decision." *River Runners*, 593 F.3d at 1067 (internal quotations omitted). Thus, the Court may not overturn an agency decision "because it disagrees with the decision or with the agency's conclusions about environmental impacts." *Id.* at 1070. It must "affirm[] the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All.*, 475 F.3d at 1140.

The Court has taken the time to review the extensive record in this case and finds that it contains evidence regarding how the Forest Service attained the goals and objectives of the Forest Plan. The record also contains evidence outlining the Forest Service's methodology and reasoning for each of the decisions it made. Even were the Court to disagree with those actions and decisions—which it is not in a place to do based on expertise—it must grant deference to the Forest Service if there is a reasonable basis for doing so. *See generally id.* In this case, the Court finds there are rational and reasonable bases for the Forest Service's various actions in this case. The Court will not overturn those decisions.

While Plaintiffs may disagree with precisely *how* the Forest Service fulfilled the requirements of its own plan, it cannot challenge those actions solely on that basis. Plaintiffs have not presented evidence that the Forest Service failed to abide by the APA, NEPA, HFRA, the Nez Perce Forest Plan, or deviated from its Memorandum Decision. Additionally, there is no indication that the Forest Service's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Absent such evidence, the Court cannot find in Plaintiffs' favor.

## VI. ORDER

1. Plaintiffs' Motion for Summary Judgment (Dkt. 16) is DENIED.

2. Defendants' Motion for Summary Judgment (Dkt. 18) is GRANTED.

3. Plaintiffs' Motion to Supplement Extra-Record Evidence (Dkt. 20) is DENIED.

4. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: December 6, 2019

David C. Nye
Chief U.S. District Court Judge